[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12577

_____

D.C. Docket No. 1:13-cr-00117-WS-C-1

UNITED STATES OF AMERICA,

                                                                              Plaintiff-Appellee,

versus

YAMAN SENCAN,
DAVID PETERSEN,

                                                                              Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

(October 23, 2015)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBRENO,[*] District Judge.

---

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

PER CURIAM:

Yaman Sencan, David Petersen, Stephen Merry, and Timothy Durkin were charged in a 20-count indictment for crimes related to a Ponzi scheme.  The indictment charged them with conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371 (Count 1), one count of aiding and abetting securities fraud, in violation of 15 U.S.C. § 77q and 18 U.S.C. § 2 (Count 2), and 18 counts of aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 2 and 1343 (Counts 3-20).

Durkin fled the country and has yet to be apprehended.  The other three (collectively referred to as "Defendants") pled not guilty and proceeded to trial.  At the close of the Government's case, and again at the close of all the evidence, Defendants unsuccessfully moved for judgments of acquittal.  Defendants were convicted on all counts and each sentenced to 60 months' imprisonment.  Sencan appeals his conviction; Petersen appeals his conviction and sentence.[1]  After a careful review of the record and with the benefit of oral argument, we AFFIRM.

## I.   BACKGROUND

Defendants operated a classic Ponzi scheme between 2009 and 2012.  "The modus operandi of a Ponzi scheme is to use newly invested money to pay off old

---

[1] Because Defendant Merry died while the appeal was pending, this Court dismissed his appeal as moot.

2

investors and convince them that they are earning profits rather than losing their shirts." *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1207 n.5 (11th Cir. 2013) (internal quotations omitted). To that end, Defendant Sencan, the project's "go-to man," explained to potential investors that a company named Westover Energy Trading, LLC ("Westover")[2] had developed a computer algorithm to make rapid, highly profitable stock trades. By investing in Westover, Sencan boasted that investors would earn 25% returns with virtually no risk. The truth was that only a fraction of investors' funds were transferred to Westover and invested. The rest was distributed to earlier investors as "profits" from stock trades, or kept by Defendants.

Sencan got each new investor to enter into a "co-investment agreement" with RAMCO and Associates, LLC ("RAMCO"), a company that Defendant Merry and his wife owned. According to the agreement, RAMCO had an "ongoing relationship" with Westover permitting it to invest funds in Westover's "automated proprietary trading platform." Under the agreement, investors would wire their money to RAMCO, which in turn would transfer all funds to Westover for investment. RAMCO was authorized to receive 50% of the net profits generated from Westover's trading program, but it was not authorized to take any

---

[2] Defendant Durkin, the fugitive, was Westover's managing partner.

of the investors' principal, nor was it entitled to any fees until actual profits were earned. Sencan provided all potential investors with a copy of this agreement.

Instead of complying with the agreement, Sencan instructed investors to wire their funds to an entity called "RAMCO 1 Business Trust" ("RAMCO 1"), a Nevada business trust formed by Petersen and Merry. Petersen served as RAMCO 1's accountant, and he and Merry exercised exclusive control over the trust's bank account. The victims, however, were never informed that their investments were going to a trust that gave Petersen and Merry untethered control over their money.

After investors wired their money to the RAMCO 1 account, Sencan would tell Petersen how to divert the funds. Instead of investing the funds with Westover, Petersen would transfer them from RAMCO 1 into various business and personal accounts that he, Sencan, and other conspirators controlled. At that point, Defendants would distribute some of the funds to investors, who believed they were receiving profits, and would use the rest for personal expenses.

To convince investors that Westover's trading technology was profitable, Petersen prepared weekly financial statements and sent them to Sencan, who then forwarded them to investors. Because the statements falsely reported steady

profits, they were instrumental in swaying investors to sink additional money into the scam—and to encourage their friends and family to do likewise.[3]

In January 2012, Sencan told investors that RAMCO and Westover were ending their investment relationship and that RAMCO would return all investments, including profits, after the final trades. But the investors never saw their money again. As investors repeatedly demanded their money back, Sencan reassured them that he was trying to solve the problem and blamed Westover for the delay in releasing the funds. Of course, Sencan knew that little if any of the money went to Westover in the first place.

As these events unfolded, investors became suspicious that they were victims of a Ponzi scheme. Indeed, between November 2011 and July 2012, Sencan had been warned several times by different investors, and ultimately even by the FBI, that he was actively involved in a Ponzi scheme. Yet, this news did not slow him down, and he continued to send financial statements and reassure investors until the scheme finally imploded and this criminal prosecution followed.

In the end, investors placed $4.6 million in the RAMCO 1 account, from which Sencan, Petersen, and other conspirators stole $1.5 million and distributed

---

[3] Sencan also told investors that he had invested his own life savings in Westover, which it turned out amounted to around $40,000 from the sale of a piano. In contrast, many investors were transferring hundreds of thousands of dollars to RAMCO 1. Tellingly, Petersen never invested his own money in the scheme, even as he prepared financial reports showing 25% returns.

$3.1 million, as Ponzi payments, to earlier investors. Sencan used $102,000 of the investors' money for personal expenses and transferred $175,000 to his wife, for a total haul of $277,000. Petersen spent $252,000 of investor funds on personal expenses, including mortgage payments, credit card payments, and car payments.

## II.  DISCUSSION

### A. Defendant Sencan

Sencan's only argument on appeal is a challenge to the sufficiency of the evidence to sustain his convictions. We review challenges to the sufficiency of evidence *de novo*. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). We review the evidence in the light most favorable to the Government and resolve all reasonable inferences in favor of the jury's verdict. *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of evidence." *United States v. Byrd*, 403 F.3d 1278, 1288 (11th Cir. 2005).

To sustain a conviction for conspiracy to commit a fraud, the Government must prove that a defendant "knew of and willfully joined the unlawful scheme to defraud." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Circumstantial evidence can be used to prove knowledge of a scheme. *Id.* Furthermore, "[a] scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to

6

deceive another out of money or property." *Id.* Sencan argues that the record is devoid of evidence that he intentionally participated in a fraudulent scheme, or that he knowingly made a material misrepresentation. We find the evidence to be more than adequate.[4]

As described above, Sencan regularly instructed investors to wire money to RAMCO 1, after which he instructed Petersen to divert the money into other accounts, not to Westover. For example, in July 2011, an investor wired $100,000 to RAMCO 1 expecting it to be invested using Westover's advanced computer program. That same day, Sencan instead told Petersen to distribute the sum to various investor accounts. Consistent with those instructions, Petersen moved $12,800 into a business account that he and Merry controlled. He also wired $86,980 to Sencan, who used those funds to pay two investors, keeping a cut of $17,000 for himself. None of the money was moved to Westover as promised in the co-investment agreement. Despite knowing that these funds were not being invested with Westover—meaning there was no chance that investors would earn a profit or necessarily even get their principal back—Sencan continued to send investors weekly emails falsely showing they were earning major profits. Then,

---

[4] Our sufficiency-of-the-evidence analysis also applies to both the substantive securities and wire-fraud charges because these crimes require proof of the underlying scheme to defraud. *See* 15 U.S.C. § 77q (criminalizing the use of interstate communications in the offer or sale of securities in a scheme to defraud) and 18 U.S.C. § 1343 (criminalizing the use of wire communications in interstate commerce in the course of a scheme to defraud).

when investors began to make requests for their money, Sencan reassured investors by telling them that he was in the same situation they were, even though he had earned back his $40,000 investment several times over, funneling nearly $300,000 of investors' money to his personal account and to his wife.

These acts alone demonstrate Sencan's knowledge that he was part of a fraudulent scheme. Further, the Government presented evidence confirming that Sencan was on notice of his wrongdoing as he continued to participate in the fraud. Specifically, even when Sencan was warned several times by investors and the FBI that he was involved in a Ponzi scheme, he failed to heed the warnings and continued to send monthly statements to investors. Based on the evidence, the jury reasonably concluded that Sencan knew he was involved in a Ponzi scheme and knowingly made material misrepresentations to investors.[5] Sencan's convictions are therefore AFFIRMED.

### B. Defendant Petersen

---

[5] Sencan argues that he was "even more persuasively entitled to a . . . judgment of acquittal" after investor Bill Abrams, who had warned Sencan about being involved in a Ponzi scheme, testified that he did not believe that Sencan intended to deceive him. Essentially, this argument asks us to weigh the persuasiveness of various pieces of evidence, which is the wrong inquiry. Rather, we are to "accept all reasonable inferences and credibility determinations made by the jury," as "[t]he jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989). Because the jury could have reasonably believed that Abrams was wrong about Sencan's intentions or simply determined that Abrams was not credible on this point, Abram's testimony does not somehow make the evidence insufficient to support Sencan's conviction.

Petersen argues that (1) there was insufficient evidence to support his conviction, (2) the evidence at trial materially varied from the indictment, (3) prosecutorial misconduct warrants reversal, (4) the Government failed to turn over financial documents to the defense before trial, (5) the court erred in not applying the "minor participant" reduction under the Sentencing Guidelines, (6) the court erred in calculating the loss and restitution amounts, and (7) appointed appellate counsel was prejudiced because he was only permitted 35 days to review the record.

### 1. *Sufficiency of the Evidence*

Defendant Petersen similarly mounts a sufficiency challenge, arguing that he merely used the weekly data supplied by Westover to prepare the charts he sent to Sencan, who in turn sent them to investors. Nevertheless, there was sufficient evidence to convict Petersen.

First, Petersen committed acts that were necessary for the ongoing success of the scheme. He co-owned RAMCO 1, served as its accountant, received monthly account statements, diverted investor funds that were supposed to go to Westover, and generated the account statements sent to investors that falsely reported profits on their investments. Indeed, these false financial statements he prepared were crucial to recruiting investors and keeping them in the dark. *See United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) ("A

misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." (internal quotations omitted)).

As to his knowledge that he was facilitating a fraudulent scheme, Petersen was necessarily aware that the account statements he was creating contained false information because there were, in fact, no profits being earned by the victims' investments. Moreover, he was necessarily aware that instead of being invested, the victims' funds were either being used to make payments to earlier investors or were being diverted to coconspirators. In fact, he clearly knew that he had received a substantial sum of money skimmed from the investments. The jury therefore could reasonably have concluded that the material misrepresentations found in the financial statements created by Petersen were made knowingly by him.[6]

Further, even if Petersen, himself, did not make material misrepresentations to investors,[7] he was convicted of wire and securities fraud under an aiding and abetting theory. "To prove aiding and abetting, the government must demonstrate that a substantive offense was committed, that the defendant associated himself

---

[6] As noted, Petersen invested none of his own money in Westover even though it supposedly promised high returns at low risk. This fact further suggests that he knew the fraudulent nature of the scheme.

[7] Although Petersen states that he never directly communicated with investors, there was evidence he communicated with and personally lured at least one investor into the scam.

10

with the criminal venture, and that he committed some act which furthered the crime." *United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir. 1990). In short, there was sufficient evidence to allow the jury to conclude that Petersen both furthered the scheme and did so knowingly.

### 2. *Material Variance*

Petersen next argues that his convictions should be reversed due to a material variance between the indictment and the evidence presented at trial. "The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: First, whether a material variance did occur, and, second, whether the defendant suffered substantial prejudice as a result." *United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999). In evaluating substantial prejudice, we consider whether "the proof at trial differed so greatly from the charges that appellant was unfairly surprised and was unable to prepare an adequate defense." *United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997).

According to Petersen, the evidence at trial materially varied from the indictment in three ways: (1) the indictment alleged that Defendants falsely represented that a New York real estate mogul was a principal investor in Westover, yet the trial evidence showed that the investor *was* actually associated with the firm; the Government changed its theory of the conspiracy at trial by

11

showing evidence of a separate conspiracy without Defendant Durkin, the fugitive; and (3) the Government turned the trial into a "tax case" by introducing tax documents into evidence.

First, the trial evidence was consistent with the indictment's allegations that the New York real estate mogul was not a major investor and had not authorized his name to be associated with Westover.  More to the point, any variance on this issue could not have affected Petersen's ability to prepare an adequate defense, for the evidence of his guilt stemmed from his ownership of the RAMCO 1 account and the preparation of false investor statements, not anything specifically related to this investor.

Next, the Government did not seek to prove a different conspiracy at trial.  The Government mentioned Durkin's participation in the scheme throughout trial.  Naturally, because Durkin had absconded and was not on trial, the Government spent much less time focusing on his participation in the fraud.

Finally, the Government's introduction of tax returns into evidence did not turn the proceeding into a "tax case."  Petersen could not have been unfairly surprised that the Government used RAMCO 1 tax documents to prove that he moved money in and out of the trust account.  In sum, there was no material variance at trial causing substantial prejudice.

      *3. Prosecutorial Misconduct*

Petersen argues that his conviction should be reversed because of prosecutorial misconduct. He specifically asserts that the lead investigative agent (1) gave incomplete and misleading trial testimony, (2) failed to investigate a primary witness; and (3) failed to zealously seek the extradition of Durkin.

To establish a prosecutorial misconduct claim, Petersen must show the Government's conduct was improper and prejudiced his "substantial rights." *United States v. Hasner*, 340 F.3d 1261, 1275 (11th Cir. 2003). A defendant's substantial rights are prejudiced if there is a "reasonable probability" that, but for the misconduct, "the outcome of the trial would have been different." *United States v. Capers*, 708 F.3d 1286, 1308–09 (11th Cir. 2013). Because Petersen did not object to the alleged improper conduct below, we review only for "plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997).

With respect to the lead agent, Defendants cross-examined him about his investigation and had the opportunity to clarify any incomplete or misleading aspects of his testimony. We find nothing improper about his testimony or investigation. Nor was there misconduct surrounding efforts to extradite Durkin. In fact, the Government had taken numerous steps to alert domestic and

international law enforcement agencies to Durkin's pending arrest warrant. Finally, Petersen failed to articulate how the outcome of his trial would have been different absent this alleged misconduct, given the ample evidence supporting his conviction. We find no plain error.

### 4. *Brady* Issue

Petersen makes a passing reference in his brief to a *Brady*[8] violation, stating that some financial documents were not turned over to the defense until the parties were preparing for sentencing. "A passing reference to an issue in a brief is not enough [to preserve it for appellate review], and the failure to make arguments and cite authorities in support of an issue waives it." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). Because Petersen supplies no facts or legal arguments to support his *Brady* claim, we cannot meaningfully examine it.

### 5. *Minor Role Reduction*

Petersen contends that he was entitled to a minor role adjustment[9] for sentencing purposes in view of the total conduct of the conspiracy and his role relative to his coconspirators. A determination that a defendant is not qualified for

---

[8] Under the rule first announced in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), prosecutors are required to disclose evidence favorable to a defendant where the evidence is material to the defendant's guilt or punishment.

[9] Under U.S.S.G. § 3B1.2(b), the defendant may receive a two-point reduction "[i]f the defendant was a minor participant in any criminal activity."

14

a role reduction is a finding of fact reviewed for clear error.  *United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).  In determining whether to grant a minor role reduction, "(1) the court must compare the defendant's role in the offense with the relevant conduct attributed to him in calculating his base offense level; and (2) the court may compare the defendant's conduct to that of other participants involved in the offense."  *United States v. Alvarez-Coria*, 447 F.3d 1340, 1343 (11th Cir. 2006).  "[A] defendant is not automatically entitled to a minor role adjustment merely because [he] was somewhat less culpable than the other discernable participants."  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1320–21 (11th Cir. 2010) (quotations omitted).

The district court did not clearly err by denying a minor role reduction.  In light of Petersen's involvement, the court reasonably concluded that Petersen was not substantially less culpable than the other participants.  *See Alvarez-Coria*, 447 F.3d at 1343.  In any event, any error was harmless.  An error in calculating the Guidelines range is harmless if (1) the district court would have imposed the same sentence regardless of its ruling on the Guidelines issue, and (2) the sentence would be reasonable even if that issue had been decided in the defendant's favor.  *See United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

Here, the Guidelines range was 135 to 168 months' imprisonment, yet the court imposed a below-Guidelines sentence of only 60 months.  Further, the court

declared that it would have imposed the same 60-month sentence even if it had granted the role reduction.  In fact, had the court granted the requested two-point reduction, the adjusted range would have been 108 to 135 months.  The 60-month sentence imposed was well below the range to which Defendant contends he was entitled.  Further, we conclude that a 60-month sentence was reasonable no matter the Guidelines range.  In fact, the district court considered all the relevant factors under 18 U.S.C. § 3553(a) and made findings supported by the record.  Based on these findings, the resulting below-Guidelines sentence of 60 months' imprisonment was within "the range of reasonable sentences dictated by the facts of the case."  *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) (quotation marks omitted).  Thus, even were there any error, it would have been harmless.

### 6.  *Loss-Amount Calculation*

Petersen also argues that the court double-counted the loss suffered by one of the victims and thus overstated the total loss by at least $683,000.  Based on calculations asserted for the first time on appeal, he states that the correct loss amount should have earned him a 16-level sentencing enhancement, not the 18-level enhancement shown in the presentence report and applied by the district court.

We review the district court's loss determination for clear error. *See United States v. Grant*, 431 F.3d 760, 762 (11th Cir. 2005). However, "a party may not challenge as error a ruling or other trial proceeding invited by that party." *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) (quotations omitted). Invited error exists when a party's statements or actions induce the district court into making an error. *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006).

An insurmountable problem for Petersen is the fact that he not only failed to make this argument below, but he also acquiesced to the correctness of the loss calculation made by the district court. Specifically, prior to sentencing, defense counsel had expressed concern that victims who had invested in the Ponzi scheme, both individually and through corporate investor EMR, might receive double restitution under the wording of the proposed judgment. To eliminate that risk, Petersen's counsel suggested that the district court strike "Spellmeyer" from the phrase "EMR/Spellmeyer" in the table of losses to clarify that EMR alone was entitled to restitution for the corresponding loss. Articulating no objection to the total loss amount, counsel said the court should enter the judgment with his proposed modification, and the court did so, making clear that the loss amount in the PSR remained unchanged. In fact, had Petersen wanted to object to the loss amount, the Government indicated that it had a witness prepared to testify about that amount. In short, even assuming that the district court erred in its calculation

of loss, Petersen invited the error. Moreover, as discussed above with regard to the minor role adjustment, the district court indicated that its 60-month sentence was the sentence it would have imposed, based on § 3553 factors, regardless of the Guidelines calculations.

### 7. *Time Permitted for Counsel on Appeal*

Lastly, Petersen argues that he was prejudiced because his appointed appellate counsel was afforded only 35 days to review the trial record. Petersen was granted a one-week extension and then was granted leave to file his brief out of time. Petersen fails to show that he was prejudiced.

## III.   CONCLUSION

For the foregoing reasons, we affirm Sencan and Petersen's convictions, and we affirm Petersen's sentence.

**AFFIRMED**.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Amy C. Nerenberg
Acting Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 23, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 14-12577-FF
Case Style: USA v. Yaman Sencan
District Court Docket No: 1:13-cr-00117-WS-C-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

AMY C. NERENBERG, Acting Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion